SUPERIOR OIL CO., et al. *v.* FOOTE, et al.

Feb. 23, 1953

No. 38562        21 Adv. S. 101        63 So. 2d 137

*Wells, Thomas, Wells & Smith,* and *W. B. Wagner* and *Murray Christian,* for appellants.

*Buchanan & Montgomery,* and *Alexander & Alexander* and *J. E. Skinner,* for appellees.

Roberds, J.

Alfred Foote, Urban B. Hughes, Henry N. Toler and W. S. Gordon, the appellees, owned together a one-half interest in the mineral rights in and under three tracts of land located in the Gwinville oil and gas field in Jefferson Davis County, Mississippi. The parcels embrace

tracts of 19 and 105 and 20 acres situated, respectfully, in units 10, 32 and 33 in said oil and gas field. Appellees filed the bill herein against Superior Oil Company, as lessee of, and certain other royalty and mineral owners in, said three tracts, seeking, among other things, (1) to cancel the leases of Superior, which were acquired prior to acquisition of the rights of complainants, as a cloud upon their titles, and (2) to recover of Superior, as operating lessee, the entire value of their one-half royalty interests in gas which had been produced by Superior from three gas wells—one upon each of said units—in proportion as complainants' acreage bore to the total acreage of each unit, less "the cost of development and operation of such wells." The chancellor cancelled the leases, ordered an accounting and rendered a money judgment against Superior as prayed for in the bill.

This is a companion case to that of Superior Oil Company v. Roy Beery, No. 38,528, this day handed down. The controlling facts are substantially the same in the two cases. That case, and those cited therein, settle the essential questions involved in this case. We might only add that this Court has adjudicated that the three units here involved were validly and legally established. Green v. Superior Oil Co., ......... Miss. ........., 59 So. 2d 100, and Superior Oil Co. v. Foote, et al., ......... Miss. ........., 59 So. 2d 85.

This means that the leases here involved are valid, subsisting leases and appellees are entitled only to their proportionate share of the gas produced under said leases.

Reversed and remanded.

*McGehee, C. J.,* and *Kyle, Holmes, Arrington, Ethridge* and *Lotterhos, JJ.,* concur.

*Hall, J.,* took no part.

Lee, J., Dissenting.

For the same reasons stated in my dissent in the case of The Superior Oil Company, et al. v. Roy Beery, No.

38,528, this day decided, I respectfully dissent in this case.

ON SUGGESTION OF ERROR

Apr. 27, 1953          29 Adv. S. 46          64 So. 2d 355

McGEHEE, C. J.

In the former opinion rendered herein on February 23, 1953, it was stated that this case was a companion one to that of Superior Oil Company v. Roy Beery, No. 38,528, decided on the same day; that the controlling facts are substantially the same in the two cases. The opinion then called attention to the fact that this Court had theretofore adjudicated that the three gas units involved were validly and legally established. Unit No. 10 of the Gwinville Gas Field was involved in the case of Green v. The Superior Oil Company, (Miss.) 59 So. 2d 100, and units 32 and 33 in said gas field were involved in The Superior Oil Company v. Foote, et al., 214 Miss. 857, 59 So. 2d 85.

It is now strongly urged on suggestion of error that the decision in the instant case should not be controlled by the decision rendered on February 23, 1953, in the case of The Superior Oil Company v. Roy Beery, No. 38,528, for the reason that in the Beery case, Unit No. 39 had been fully and completely established, and the gas allowables had been allocated to the respective tracts of land in the said Unit No. 39 prior to the enactment of Chap. 256, Laws of 1948, whereas Units Nos. 32 and 33 in the instant case were not established until after the enactment of the said act of 1948, since the proceedings for the establishment of Unit No. 32 were begun on April 23, 1948, and the first allowable order was rendered on September 20, 1948, and the proceedings for the establishment of Unit No. 33 were begun on May 13, 1948, and ended with the first allowable order on October 20, 1948, and that, therefore, the act of 1948 limiting drilling units to 40 acres or less prohibited the

establishment of these two units as containing 320 acres each.

However, the decision on the former appeal reported in 214 Miss. 857, 59 So. 2d 85, renders res judicata the question of whether or not these units' were legally established in 1948 as containing 320 acres each.

Moreover, the repealing clause contained in Chap. 256, Laws of 1948, whereby Chap. 117, Laws of 1932, and Chap. 305, Laws of 1936, were repealed, expressly provided that: "The repeal of said laws, however, shall not affect any rules, regulations, or orders heretofore made by the State Oil and Gas Board under the authority thereof, but all such rules, regulations, and orders shall be and remain valid and effective for a period of only six (6) months from the effective date of this act, and their validity and effectiveness shall be as full and to the same extent as if the same were made and promulgated under the authority of this act; . . ."

Among the orders which were extended in their operation for the six months' period were those of August 11, 1947, and September 11, 1947, providing for the establishment of gas drilling units of not more than 320 acres and requiring the owners, who were defined as oil and gas lessees, to pool their leases; and we held on February 23, 1953, in the case of The Superior Oil Company v. Beery, No. 38,528, that to require the oil and gas lessees to pool their leases in the establishment of a gas unit has the effect of extending the primary term of the leases where all of the lands in the unit are placed in production by being drained from the unit well prior to the expiration of the ten-year primary term of the lease.

Unit No. 10 was fully established prior to the enactment of Chap. 256, Laws of 1948, and as held in Green v. The Superior Oil Company, 59 So. 2d 100, the legislation applicable thereto was contained in Chap. 117, Laws of 1932, and Chap. 305, Laws of 1936.

As to Units Nos. 32 and 33, the saving clause of the act of 1948 places any unit established within the period

of six months from the effective date of the act in the same status as if they had been established under the rules and regulations or orders of the State Oil and Gas Board theretofore made, since the act of 1948, as heretofore shown, expressly declares that "their validity and effectiveness shall be as full and to the same extent as if the same were made and promulgated under the authority of this act; . . ." All of the units involved in this suit were fully and completely established, and all of the lands in each of the units were placed in production prior to the expiration of the ten-year primary term of the leases in question.

All other questions raised and argued in the briefs on the suggestion of error in the instant case have been answered in the opinion on the suggestion of error in The Superior Oil Company v. Roy Beery, No. 38,528, this day rendered.

Suggestion of error overruled.

*Roberds, Kyle, Holmes, Arrington* and *Ethridge, JJ.,* concur. *Hall J.,* took no part.

LOTTERHOS, J., dissenting:

It is my opinion that the suggestion of error should be sustained. Reference is made to the dissenting opinion this day filed in The Superior Oil Company v. Roy Beery, No. 38,528. The same reasons for the dissent in that case apply in the case at bar.

There is an additional proposition in the case now under consideration which, in my opinion, was erroneously decided by the majority. It appears that Unit No. 32 and Unit No. 33 were established after the enactment of Chap. 256, Laws of 1948, but within six months after the effective date of said statute. The question is whether the board had the authority and power to force integration of mineral interests within these units at that time.

Again the difference and distinction between the establishment of a drilling unit and the forcing of integration

or pooling of mineral interests is the important consideration. If they are separate and distinct transactions, as I believe them to be, then we must determine whether the board had the power to force the integration within that six months' period, even if it be conceded that it had the power to establish a drilling unit.

By Sec. 21 of said Chap. 256, Chap. 117, Laws of 1932, and Chap. 305, Laws of 1936, as well as certain other statutes, are repealed. It is provided, however, that this repeal shall not affect rules, regulations, or orders theretofore made by the State Oil and Gas Board under the authority of said statutes, but that such rules, regulations and orders "shall be and remain valid and effective for a period of only six (6) months from the effective date of this act, and their validity and effectiveness shall be as full and to the same extent as if the same were made and promulgated under the authority of this act." Thereby those rules and regulations providing for spacing in units of 320 acres in the Gwinville field were preserved during said six months' period, but it is to be noted that their validity and effectiveness were to be to the same extent as if they had been made and promulgated under the 1948 act.

Turning now to Secs. 6(c)(11) and 9(a) and 9(b) of said Chap. 256, we find that the board was expressly granted the power to establish drilling units and that there was no limitation imposed with respect to the size of those units. Therefore, the rules and regulations made under the prior acts as so extended were effective to authorize and empower the establishment of 320 acre drilling units in the Gwinville field. Previous decisions of this Court have upheld the establishment of such units within that period of time. However, when we examine Sec. 10(a) of said Chap. 256, we find a different situation. It is there provided that when separately owned tracts are embraced within an established drilling unit "the person owning the drilling rights therein and the rights to share in the production therefrom" may

agree to integrate their interests. In this case, there is no limitation on the acreage, so that a voluntary integration of interests by agreement of the parties might be accomplished within a 320 acre drilling unit. But it is further provided that if such persons have not agreed to integrate their interests, the board may, "as to a drilling unit of 40 acres in area or less, but as to no drilling unit of greater area," require such persons to integrate their interests. It is obvious that the 40 acre limitation is positively and categorically imposed to prevent the board from forcing integration in the case of units exceeding 40 acres.

The effect of the original opinion in the case at bar and of the majority opinion on the suggestion of error is to hold that the board had the power and could in fact force the integration and pooling of the mineral interests in a unit consisting of 320 acres. That power is supposed to have been exercised under regulations adopted under the 1932 and 1936 statutes and preserved in effect after the repeal of those statutes by the saving clause in Sec. 21 above mentioned.

The difficulty is that the saving clause expressly states that those rules and regulations so carried forward would be effective to the same extent as if made and promulgated under the 1948 act. Since the 1948 act, by Sec. 10(a), expressly prohibits forced integration in case of units exceeding 40 acres in area, those rules and regulations can have no efficacy to authorize the board to take such action.

*Lee, J.,* joins in this dissent.

---

## ON MOTION TO RETAX COSTS

June 8, 1953          34 Adv. S. 176          65 So. 2d 453

ETHRIDGE, J.

This case was decided by the Court on February 23, 1953, and a suggestion of error was overruled on April 27, 1953. Superior Oil Company v. Foote, 63 So. 2d 137,

suggestion of error overruled, 64 So. 2d 355. On May 13th Clifford Bass, Chancery Clerk of Jefferson Davis County, where the case was tried, filed a motion to retax the costs in this case. The chancery clerk's original certificate of transcript fees in the record had computed the costs of the transcript at 15c per 100 words, under the old statutes, Code of 1942, Sections 3932 (t), 3934 (r), and the last paragraph thereof. The motion averred that such costs should have been computed under the 1950 statute on the basis of 25c per 100 words. Hence movant asked the Court to retax the costs on the latter basis. Appellees have filed a brief contesting several issues with movant.

Miss. Laws 1950, Chapter 291, being Code of 1942, Section 3932 (1952 Supp.), amended the former statute on fees of clerks of the chancery court, but made no express provision for the clerk's transcript fees. The 1950 amendment of Section 3932 omitted subsection (t), applicable to that item, which was in the act prior to 1950. However, Miss. Laws 1950, Chapter 239, amended Code of 1942, Section 3934, which deals primarily with fees of clerks of the circuit court. The last paragraph of Chapter 239 provides:

"For making final records required by law, furnishing transcripts of records, or copies of papers on file, recording instruments required by law to be recorded and copied, or of which any person is entitled to demand and receive copies, twenty-five (25c) cents for every hundred words, and four figures shall be considered one word; and the same fees shall be allowed *to all officers* for making and certifying copies of records or papers which they are authorized to copy and certify." (Emphasis supplied.)

We think that the purpose and effect of the quoted provision is to establish a fee for "all officers," including chancery clerks, of 25c per 100 words for "furnishing transcripts of records." The phrase "all officers" expresses a legislative intent to make that provision ap-

plicable to all court clerks who perform the stated functions. This interpretation is manifest not only because of the particular terms of the statute but also because a contrary interpretation would create a serious gap in the fee system for court clerks.

Appellee's brief on the motion points out that a large part of the record in this case consists of photostat copies of exhibits, such as orders and rules of the State Oil & Gas Board, and various other documents. Appellee suggests that there is no statutory fixing of any particular fee to be paid to the chancery clerk for making photostat copies of the exhibits in the transcript. Miss. Laws 1944, Chapter 196, Sections 1 and 2, amending Code of 1942, Section 878, provides that it shall be the duty of the clerk of the chancery court to record certain instruments by either entering them in handwriting or typewriting or by filling out printed forms, "or by recording by photostat machine or other equally permanent photographic process * * *." In 1952, the Legislature authorized boards of supervisors to purchase photostating machines and equipment, which shall be under the control and supervision of the chancery clerk. Miss. Laws 1952, Chapter 225, Code of 1942, Section 2900.7. Considering these statutes together with the last paragraph of Chapter 239, Laws of 1950, which provides a clerk's fee of 25c for every 100 words "furnishing transcripts of records," we think that it was the legislative purpose to make this fee system applicable to transcript pages reproduced either by typewriting or photostating process.

However, the chancery clerk failed to comply with the statutes and decisions of this Court in preparing his certified statement of transcript fees. The first item therein is the court reporter's fee according to the bill attached to the stenographer's transcript, $64.75. The court reporter's bill complies with the rule in McDonald v. Spence, infra, by stating that it is "for transcribing 64,750 words * * * at the rate of $.10 per 100 words

\* \* \*.'' But the chancery clerk's certificate concerning his fees states: ''Transcript ........................................ words at 15¢ per 100, (Code 1930, Sec. 1788-r) . . . $687.85.'' An amended statement was later filed apparently computing transcript fees at 25c per 100 words, total of $962.99, but still leaving blank the number of words for which the litigants were charged. Both statements of transcript costs wholly fail to comply with the statutes. Code of 1942, Section 1193, provides:

''The clerk shall make a statement on the transcript of the record sent to the Supreme Court of the amount of his fee for such transcript, and whether or not it has been paid to him; and, if he shall not do this, the clerk of the Supreme Court shall not be required to issue execution for such costs, nor to demand and receive the same.''

Section 1596 states: ''When a cause shall be determined, the clerk of the court, and the justice of the peace in cases had before him, shall tax the costs of the case and make out a bill thereof, specifying therein each section of the law, and each paragraph or subdivision of section, if any, by virtue of which each fee or item of costs therein is charged or taxed, and he shall file the same with the papers in the cause.''

Section 1597 provides: ''Fees and costs shall not be payable by any person until there be produced to the person chargeable with the same a bill, or account in writing, containing the particulars of such fees, signed by the clerk or officer, in which shall be intelligently expressed and specified each section of the law, and, if any, each paragraph or subdivision of section by virtue of which each fee is charged. And if any fee shall be paid without the production of such bill, the party paying the same shall at all times be entitled to demand and have from the officer receiving the same a copy of such bill without charge.''

In McDonald v. Spence, 179 Miss. 348, 176 So. 607 (1937), the Court construed these statutes with reference

to a circuit clerk's certified statement of costs. Appellants had moved to retax costs on the ground that the fees allowed to the clerk of the trial court and the court reporter were more than allowed by law. The taxation of costs incurred in the trial court was set aside and held to be void. It was said that the quoted statutes require the clerk of the trial court to render a detailed statement of his fees for making the transcript, and that the clerk's certificate showing merely the aggregate amount of fees for making transcript and for other services would not authorize taxation of costs therefor; that these statutes are mandatory upon court clerks and must be complied with by a detailed itemization of fees for the transcript, etc., before a taxation of costs can be had. The Court then said that the clerk of the trial court could file an amended certificate of costs certifying to the Supreme Court Clerk ''the number of words in the transcript made by him, and his fee therefor.'' In the instant case, the statement of costs does not show how many words are in the transcript. Although that figure could be obtained by this Court by a mathematical calculation from the figures furnished in the certificate, we think that the statute places the duty upon the clerks of trial courts to itemize each of the various costs of the transcript, and that one type of itemization would be the number of words in the transcript. The statute requires the clerk to do this, in order that the litigants and the clerk may understand fully the basis of the costs which will be taxed against the losing party. Failure to comply with these requirements renders the statement of costs null and void.

For the foregoing reasons, the motion of the chancery clerk to retax costs on the basis of 25¢ instead of 15¢ per 100 words is sustained, provided the chancery clerk promptly furnishes the Clerk of this Court with an amended, certified statement of costs of transcript which shows on it the number of words in the transcript and any other relevant detailed items.

Motion to retax costs of transcript on basis of 25¢ per 100 words sustained, on condition that the Chancery Clerk furnish a correct, amended statement of costs.

All Justices concur, except *Hall, J.*, who took no part.